### KOHN v. MEYER.

1. Findings of fact by the Circuit judge, partly from written evidence submitted to him, and partly from the testimony of witnesses orally examined before him, reversed.
2. A judgment confessed by one not then otherwise in debt, with a view to protect his property from debts which he expects to contract, or from liabilities which he apprehends may be established against him, may be set aside at the instance of subsequent creditors, as a fraud upon them.
3. Where the statement of facts out of which the indebtedness arose, contained in a confession of judgment, is false, or so grossly inaccurate as to mislead inquirers, the confession is void as to creditors of the judgment defendant.
4. A judgment never was a lien upon personal property, and since the adoption of the code of procedure an execution has no such lien until levy made.
5. *Semble:* When a debtor makes a transfer of all or a large portion of his personal property without notice to his creditors, and retains possession, using and claiming it as his own, it will require strong evidence to rebut the presumption of fraud arising from such retention of possession.

---

Before ALDRICH, J., Orangeburg, May, 1882.

This was an action by Morris Kohn and other creditors of E. M. Meyer against E. M. Meyer, A. W. Meyer and others, creditors of E. M. Meyer, commenced October 8th, 1881, to set aside a confession of judgment, and also a sale of personal property, made by E. M. Meyer to A. W. Meyer. Upon the complaint and answers and affidavits, and the examination of E. M. Meyer, taken in open court before him, under sections 407–409 of the code of procedure, Judge Hudson granted a preliminary injunction restraining the sheriff from paying out the proceeds of the sale of E. M. Meyer's stock of goods. The case was heard on its merits before Judge Aldrich, the testimony of E. M. Meyer, taken as above stated, being used as evidence, and other witnesses being examined in open court before the presiding judge. Other facts are stated in the opinion.

*Messrs. A. C. Dibble, W. L. Glaze* and *Lathrop & Webster*, for plaintiffs, appellants.

*Messrs. J. F. Izlar* and *S. Dibble*, for defendant creditors, appellants.

*Messrs. DeTreville & Glover* and *M. I. Browning*, contra.

April 17th, 1883. The opinion of the court was delivered by

MR. JUSTICE McIVER. ·This was an action brought by the plaintiffs in behalf of themselves and other creditors of the defendant, E. Milton Meyer, for the purpose of setting aside a judgment confessed by him to his father, Augustus W. Meyer, one of the defendants, upon the ground of fraud; and, also, for the purpose of setting aside the sale of certain personal property, claimed to have been made by E. M. Meyer to A. W. Meyer, on April 25th, 1881.

The judgment in question was confessed on June 9th, 1880, for the sum of $2,800, but no execution was issued thereon until September 12th, 1881. The statement required by section 400, *Lynch's Code* (now section 384), is as follows : " Upon the 31st day of May, A. D. 1880, the plaintiff sold and delivered to defendant his certain share in the stock in trade in a certain store on Russell street, in the town of Orangeburg, which was valued

at, and for which the defendant agreed to pay, the sum of $2,800, and for which amount the defendant has made his note to plaintiff, dated June 9th, 1880, payable one day after date, no part of which note has been paid; and the sum of $2,800, with interest from said date, as specified in said note, is now due and owing the plaintiff."

This statement was duly sworn to by said E. M. Meyer on the same day that the judgment was confessed, but in his answer to the complaint in this case he gives a totally different account of the origin and consideration of the debt for which the judgment was confessed, and says "that on June 9th, 1880, he made a confession of judgment to A. W. Meyer for the sum of $2,800, for certain sums lent and advanced to him by the said A. W. Meyer, for the purpose of carrying on his business in the town of Orangeburg, in the mercantile trade. First, he (the defendant) borrowed $1,800 from said A. W. Meyer when he first commenced his business aforesaid, which was put in the stock in trade of his store, and afterwards $1,000 more were advanced by the said A. W. Meyer to this defendant for the same purpose, to wit: to carry on the said business." A. W. Meyer, in his answer, only says in reference to the confession of judgment, "that the same was made for a *bona fide* debt due to this defendant for money advanced to said E. M. Meyer, and given at a time said E. M. Meyer owed no debts, to protect this defendant."

E. M. Meyer, in his testimony, gives substantially the same account of the origin and consideration of the debt to his father as that which he gave in his answer, but goes rather more into details as to the time when and circumstances under which the alleged loans were made. It appears from his testimony that he commenced business some time in the latter part of the year 1878, (in October, as it was conceded at the hearing,) and that the first loan of $1,800 was made to him to enable him to start in business, but no note or other memorandum of such loan was taken by his father until nearly two years afterwards, when the amount, without interest, was incorporated in the judgment. The next loan of $1,000, according to his testimony, was made just before he was married, which was on May 27th, 1880, about two weeks

before the judgment was confessed, when the witness said he was in need of more money.

A. W. Meyer, in his testimony, says that the confession of judgment was given for money loaned his son ($1,800) when he started business, and $1,000 just before his marriage. He took the confession of judgment so that E. M. Meyer's wife would know it was borrowed money and witness' younger children would not suffer. He further says, that when his son borrowed the $1,000 he had a note coming due and had to raise money to pay it. When the judgment was confessed would have waited twenty years, or as long as witness liked, if no one else disturbed him.

It seems, also, from E. M. Meyer's testimony, that during the time he was in business, he usually carried a stock of from $3,500 to $4,000; that he sold mostly for cash, and that his sales ranged from $300 to $800 per week, upon which he usually made a profit of 25 per cent., and yet, in the course of about three years, upon being closed up by the sheriff on September 12th, 1881, when the execution in favor of A. W. Meyer, as well as an execution in favor of Steffens & Werner, were levied upon his stock of goods, it appeared that his total indebtedness amounted to something over $6,500, while his assets, consisting solely of the stock of goods, were only estimated by himself at $3,500, and actually brought, at sheriff's sale, $2,416.

It seems, also, from the testimony of both father and son, that on April 25th, 1881, the father took a bill of sale of all the personal property of the son, outside of the stock of goods, consisting of work animals, farming implements, and the crop then just planted, but the son remained in possession, and subsequently traded one of the animals, with the knowledge and consent of the father. The origin of this transaction, as stated by both father and son, is that the son was again in need of money, and sold this property to his father for the sum of $615, a part of which ($315) was paid in cash, and the balance in May following the date of the receipt or bill of sale; but the son remained in possession of these articles until they were levied on by the sheriff, as the property of the son, under an execution

N

in favor of Bruff, Faulkner & Co., when A. W. Meyer forbade the sale, and they were left in the possession of E. M. Meyer.

The debts due the creditors established in these proceedings were mostly, if not entirely, for goods sold by them to E. M. Meyer, and were contracted at different dates, ranging from February 17th, 1881, to June 18th, 1881, and it nowhere appears in the evidence that any of the creditors had any actual notice of the confession of judgment until July 27th, 1881, when it was mentioned to the witness, Green, a salesman in the employ of Bruff, Faulkner & Co., who are the largest creditors; nor does it appear that any of the creditors even knew that the son was indebted to the father in any form until E. M. Meyer mentioned in a letter of June 30th, 1881, to Bruff, Faulkner & Co., that he had been compelled to borrow money from his father to pay a debt which pressed him.

The foregoing is a general outline of the testimony upon which the case was heard by the Circuit judge, who held that the confession of judgment was based upon a *bona fide* indebtedness of the son to the father; that there was no fraud in the transaction, and that the judgment was a valid lien. He also held that the creditors who were seeking to set aside the judgment, being subsequent creditors, could not do so. He further held that the defect in the statement upon which the judgment was confessed was a mere irregularity which could not be taken advantage of in this form of proceeding, and that no one but the defendant in such judgment could take advantage of it. As to the alleged sale of the personal property, he held that there was no necessity to consider it, for, having established the judgment to be a valid lien, the personal property would be bound by it, and, hence, it was immaterial to consider whether the transfer could be sustained, though he does go on to discuss the validity of the transfer, and plainly intimates his opinion that it was unimpeachable.

From this judgment, the plaintiffs, as well as such of the defendants as are identified in interest with them, appeal upon numerous grounds, which allege error both in the conclusion of law and fact reached by the Circuit judge, but, from the view

which we take of the case, it will not be necessary to consider, in detail, the various grounds of appeal.

We must confess that the testimony, coming as it does almost entirely from E. M. Meyer and A. W. Meyer, has made a very different impression upon our minds from that which it seems to have made upon the mind of the Circuit judge, who has certainly, upon at least two important points, entirely misconceived the testimony. In speaking of the transfer of the crop and work animals, he uses this language : " The father says, I do not want them, but if you will confess a judgment, so that your wife will understand this is a loan and not a gift, I will take the property and raise the $1,000, provided you manage the farm and crop. The son agrees to it, the confession is entered, the transfer made, the money paid, he remains in possession, and has not a creditor in the world but his father. No one is or can be hurt by this transaction. A year after, these creditors sell the son $4,000 worth of goods."

It is quite manifest that here two entirely distinct and different transactions have been confounded, viz. : the loan of the $1,000, and the alleged sale of the personal property for $615. The former took place nearly a year before the latter, for both of the Meyers testify that the loan of $1,000 was made just before the marriage of E. M. Meyer, the date of which is fixed at May 27th, 1880, and the judgment embracing this $1,000 was confessed on June 9th, 1880, while the alleged sale did not take place until April 25th, 1881, as shown by the receipt or bill of sale offered in evidence. These two different matters are not only confounded, but the statement that the son, at the time of the alleged sale, had not a creditor in the world is not only without any evidence to sustain it, but is directly in conflict with the undisputed testimony, which shows that a large part of his present indebtedness was contracted prior to April 25th, 1881.

But there is another more important misconception of the testimony. It is assumed, throughout the discussion in the Circuit decree as to the validity of the judgment, that the creditors had actual notice of the confession of judgment before they sold goods and extended credit to E. M. Meyer; as it is expressed in

one place, " The elder Meyer did not hold out inducements to them to sell to his son; did not encourage them; on the contrary, he warned them of his prior lien; his son and these creditors made the confession a subject of discussion at the time the debts were contracted." And again, " These creditors came to Orangeburg a year or more after the confession was entered; they saw it; they knew it; they talked about it, and then extended their credit." It is difficult to see how the Circuit judge could have so far misconceived the uncontradicted testimony in the case except upon the supposition that two totally distinct matters have again been confounded. The debts were contracted, as we have seen, at different dates, from February 15th, 1881, to June 18th, 1881, and there is not a particle of testimony even tending to show that any one of the creditors ever knew or heard of the confession of judgment until July 27th, 1881, after which date, so far as appears, not a single debt was contracted. Indeed, until the letter of E. M. Meyer of June 30th, 1881, to Bruff, Faulkner & Co., which was after the last debt was contracted, it does not appear that any of the creditors ever heard that E. M. Meyer was indebted to his father in any form.

The Circuit judge, therefore, in making the statements which we have quoted from his decree, must have confounded what occurred after the creditors had learned of the confession of judgment, when they were endeavoring to secure their debts, with what occurred when such debts were contracted. In view of these manifest errors in the Circuit decree, we feel less hesitation in taking our own view of the testimony than we would otherwise feel. It is true that both the Meyers testify that this son, E. M. Meyer, was not in debt to any one at the time the confession of judgment was taken, and the Circuit judge has adopted their testimony as establishing that fact in the case, upon which his whole judgment mainly rests. How A. W. Meyer could know this fact it is not easy to see, especially when, by his own account, he seems to have been singularly ignorant of the business of his son, although living in the same town with him, carrying on a similar business but a few doors from him, and not only claiming to be by far his largest creditor, but hav-

ing good reason to know, from the applications to him for help, that the son was certainly not managing well.

It seems to us incomprehensible how, in the short space of three years, the younger Meyer could have become so involved in debt as he represents himself to be, if he has given a correct account of the manner in which he has managed his business. According to his account, he started business in the latter part of 1878, with a cash capital, borrowed from his father, of $1,800, upon which he was not required to pay any interest for nearly two years—nearly one-half of the amount of stock which he usually carried; that he sold goods almost entirely for cash, usually at a profit of twenty-five per cent.; that his capital, in less than two years afterwards, was increased by a further loan of $1,000, and yet, at the expiration of about three years, he finds himself hopelessly involved—owing debts amounting to something more than $6,500, and with assets only estimated to be worth $3,500 and actually selling for $2,416, and this, too, without the slightest evidence that he had been engaged in any speculation or that he was addicted to gambling or any other bad habits which would lead to a waste of his means. Looking at these facts, which, of course, E. M. Meyer cannot dispute, as they are gathered from his own testimony, we think that the most charitable construction which can be put upon them is, that, while his bald declaration that he owed no debts at the time the judgment was confessed, may possibly be nominally true, yet that he must have been constantly making debts, and paying one by making a debt to another.

But be this as it may, we think that the Circuit judge erred in holding that a confession of judgment cannot be set aside for fraud, except at the instance of creditors whose debts were contracted before such confession was taken, and that subsequent creditors cannot attack it. If a person, though not in debt at the time, confesses a judgment with a view to protect his property from debts which he expects to contract, or from a liability which he apprehends he will be subsequently subjected to, the judgment may be set aside as a fraud upon such subsequent creditors. *State* v. *Fife*, 2 *Bail.* 337; *Lowry* v. *Pinson*, 2 *Id.* 324. Moreover, the testimony of both father and son

distinctly shows that at the time of the alleged loan of $1,000, only a very short time before the confession was taken, the son was in debt and made that a pretext for borrowing that sum, but whether it was used in the payment of such indebtedness does not appear from the testimony of either father or son. The elder Meyer says: "When he borrowed the $1,000 I did not have the money; he had a note coming due, and had to raise money to pay it." But whether the note became due before the confession was taken, and whether it was paid, is nowhere stated by either father or son, but it does appear from the testimony of Hickman, that A. W. Meyer told him that his son had spent a considerable portion of the $1,000 in furnishing his house, just before his marriage. We think, therefore, that there is every reason to believe that E. M. Meyer was in debt at the time the $1,000 was obtained, and at the time when the confession was taken; certainly that the confession was taken to protect the property of the son from future indebtedness which he was constantly contracting.

But aside from all this, there is another fatal objection to the confession of judgment. It does not comply with the requirements of section 400 *Lynch's Code* (now section 384), inasmuch as it does not state the facts out of which the debt arose, which it was given to secure. As we have said in the recent case of *Ex parte Carroll*, 17 *S. C.* 450: "The judgment in question derives its origin from a special statutory provision, and to make it valid the requirements of the statute must be strictly complied with. *Freeman on Judgments*, § 543. * * * The object of the statement required by the code is to protect creditors against fraudulent confessions of judgment by giving them such information as will enable them, by inquiry, to ascertain whether the alleged indebtedness is *bona fide* or pretensive and fraudulent, and if the statement fails to furnish such information, then the judgment based upon it must be regarded as fraudulent and void as to other creditors even though it may be valid as between the parties to it who may be estopped from questioning its validity." See also the case of *Weinges* v. *Cash*, 15 *S. C.* 61, where this subject is discussed.

From what is said in these cases it is clear that the failure to make the statement as required by the section of the code above cited, is not a mere irregularity, but renders the judgment void as to creditors whether antecedent or subsequent; for as to them it is no judgment inasmuch as it fails to comply with one of the essential requirements of the statute, which alone is the authority for taking a judgment in this form; and it is only upon the principle of estoppel that it is good between the parties. If, as is abundantly established by the authorities, a defective statement renders such a judgment void as to creditors, nothing would seem to be clearer than that a false statement, or even one so grossly inaccurate as to mislead the inquirer, would also render the judgment void. Certainly if mere omission to give such information as will enable creditors to prosecute any inquiry into the *bona fides* of the judgment, is fatal to the validity of the judgment, giving false information, or such as would mislead inquirers, ought to have the same effect. A failure to give any information is less likely to defeat the object of the statute than the giving of false information, or such grossly inaccurate information as to throw the inquirer off instead of putting him on the track.

Applying these principles to the case in hand, it is perfectly manifest that the judgment in question is void as to creditors. If the answers and the testimony of the two Meyers are to be believed, then it is quite clear that the statement upon which the judgment was based was absolutely false, or, to put it in the mildest form, was so grossly inaccurate as to mislead any creditor who should have undertaken to inquire into the *bona fides* of the judgment. Not a single fact stated in it is true, except as to the amount of the indebtedness. The date of the origin of the indebtedness is fixed in the statement at May 31st, 1880, while the testimony fixes it, as to the larger part, nearly two years before, and of the remainder at some time prior to May 27th, 1880. The consideration alleged in the statement is the sale of A. W. Meyer's share in the stock of goods to E. M. Meyer, while the testimony shows that A. W. Meyer never had any interest in the stock of goods, and that the real consider-

ation was money borrowed to buy goods—not the stock which was in the store May 31st, 1880, but the stock purchased when he first started business, nearly two years before.

The attempt, therefore, to reconcile this glaring conflict by the supposition that E. M. Meyer " described the indebtedness as stock in trade of his father, because the goods had been paid for with the money he had borrowed from him," seems to us far-fetched and unreasonable. It could hardly be pretended that the stock of goods in the store on May 31st, 1880, the day fixed by E. M. Meyer, in the statement, as the date of the origin of the indebtedness, was the stock of goods which he had purchased with the $1,800 loaned him by his father, when he started business in October, 1878. And as to the $1,000, alleged to have been borrowed just before the confession was taken, there certainly is not a shadow of pretense that it could be represented by the stock of goods then in the store. Perhaps the more reasonable supposition would be, that this radical difference in the account given of the origin of the indebtedness upon which the confession of judgment was based, was due to the allegation of partnership in the complaint. We are entirely satisfied, therefore, that the statement upon which the confession of judgment was based, was either false or so grossly inaccurate as to mislead creditors, rather than assist them in prosecuting their inquiries into the *bona fides* of the judgment, and that, upon the principles above announced, the judgment is void as to the creditors, and should have been so declared.

As to the alleged sale of the personal property, it is manifest that the judgment below must be reversed, as it is based upon error of law, in holding that as " the judgment is a valid lien, there is no necessity to consider the transfer of personal property, for that is bound by the judgment." Judgments never were a lien upon personal property, and under the code an execution had no lien until it was levied, and it does not appear that there ever was any levy under the execution issued on the judgment by confession, upon the property transferred. It is true that the Circuit judge does go on to indicate very plainly his opinion that the transfer was a valid one, and could not be assailed by the creditors, but his conclusion rests largely upon what has

been seen to be an error of fact, to wit, that E. M. Meyer was not in debt at the time when the transfer was made.

But, inasmuch as no distinct judgment was rendered as to the validity of this transfer, we, perhaps, ought to refer that matter back to the Circuit Court. In doing so, however, we do not wish to be understood as endorsing the views thrown out by the Circuit judge as to this matter. It seems to us that when a person who is in debt at the time, makes a transfer of all, or a large portion of his personal property without notice to his creditors, and retains possession, using and actually claiming it (as was said by one of the witnesses, E. M. Meyer did,) as his own, it will require strong evidence to rebut the presumption arising from such retention of possession. See the case of *Pringle* v. *Rhame,* 10 *Rich.* 72, where the authorities upon this subject are collected and commented on.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that court, with instructions to render judgment declaring the confession of judgment from E. M. Meyer to A. W. Meyer void as to the creditors of the former; and to hear and determine the question whether the alleged transfer of personal property by E. M. Meyer to A. W. Meyer, is valid as against the creditors of said E. M. Meyer.